## Commonwealth *v.* Morgan, Appellant.

608

Argued March 22, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Lemuel B. Schofield,* with him *Frank F. Truscott* and *Marvin Comisky,* for appellant.

*Raymond V. John,* Assistant District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, April 12, 1948:

This is an appeal from the affirmance by the Superior Court of the judgment and sentence of the Court of Quarter Sessions of Philadelphia. On March 28, 1946,

a warrant was secured by Mrs. Anna Valenti charging Dr. William A. Morgan with assault and battery, aggravated assault and battery, assault and battery with intent to ravish, rape, and adultery. Defendant was found guilty on all counts except that of adultery.[1] He was sentenced to the penitentiary for a term of one to three years and a fine of $1,000 was imposed. The judgment of conviction was sustained by the Superior Court.

Mrs. Valenti was married on February 11, 1943. Between July 1943 and January 1946 her husband was in the armed forces. During that period she and he occasionally spent a few days together. Some time in April 1943 she visited Dr. Morgan for intimate medical treatment. During that period the doctor made no amorous advances toward her. Between December 1945 and March 1946 she made about a dozen other visits to the doctor's office for the same kind of medical attention. Treatments involved exposure of the person but the patient observed nothing objectionable in her physician's conduct until about 7:15 P.M. on March 26, 1946, when she was again in the doctor's office for treatment. She took off some of her clothing preliminary to the treatment and she lay on the table on her back. The doctor then touched her breast and made an offensive remark. The position she first assumed on this occasion and the method of treatment were in accordance with those on previous occasions. The doctor then directed her to get into another position, described as a "knee chest position", one that she had never before taken. The doctor assisted her in getting into it. While her body was thus arranged and her gaze was averted from the doctor she claims that he raped her. It is not necessary to embody in this opinion all the unsavory details of this alleged indecent assault. Her story when credited by a jury, as it was, justified defendant's conviction of rape.

---

[1] As to Dr. Morgan's marital status there was no evidence offered.

As soon as Mrs. Valenti realized what had happened she jumped off the table, and the doctor "turned to a corner of the room and was fumbling in front". He said to her, "What is the matter?" She said, "You know what the matter is." The witness was "frightened and terrified". She added, "My only thought was to get out." She "ran in the office and took her coat and bag and ran out". Her husband, in working garb, was outside in a car waiting for her. She said to him: "Take me to a doctor; take me to the hospital." She said: "I was all confused. . . . he wanted to know what was wrong. I was afraid to tell him because I didn't want him to go back in and start any commotion. My husband is big and I was afraid he might kill him [the doctor] and get himself in trouble." Her husband started "to shake her" and he said, "Well, what happened? You wouldn't come out like this if nothing was wrong." Her husband then went to the doctor's office. She followed him shortly thereafter. She said, "my husband tried to quiet me down and Dr. Morgan started to come towards me, as if to console me and I said, 'Go away. Don't you dare touch me. You ought to be ashamed of yourself. You are not fit to be a doctor and I am going to have you arrested.' " The doctor said, "Well, there is the phone. There is the phone. Call the cops." She said, "I didn't do it because I hadn't told my husband the complete story." Dr. Morgan then said that she was crazy. Her husband then said to the Doctor, "She is pretty upset and I will take her outside and leave her outside, but I am coming back because I want to talk to you." When her husband got her home five or ten minutes later she was hysterical and a physician had to be sent for. After the physician came that night the witness said she broke down and in the presence of her brother-in-law and sister-in-law the story came out what had happened. Two days later a warrant was sworn out for Dr. Morgan's arrest. The case was tried late in January 1947 and the verdict returned as above stated.

There are several assignments of error. The fourth assignment of error is as follows: "4. The . . . Judge erred in permitting the prosecutrix to give an undignified, hysterical, inflammatory and prejudicial physical exhibition of posture and position on a desk in the presence of the jury and in the court room, in an effort to discredit a statement made by the defendant on an issue which was unrelated to the question before the jury. . . ."

During the cross examination of defendant the latter said in regard to the physical position the prosecutrix claimed to have been in when raped: "Well, . . . she would have to be an acrobat to get down there. It is a very difficult thing to do. I would like to see her do that." The Assistant District Attorney asked: "You would?" "A. Yes, it is very difficult." The District Attorney said: ". . . Now, will you [Mrs. Valenti] show us how it was done?" Defendant's counsel then said: ". . . if this is an attempt by the District Attorney, which I think is objectionable anyway, to demonstrate what went on in that doctor's office—" The Court said: "Not any attempt at all. She has testified that she could get her body down, the back part of her body down, to within three inches of the table. The doctor said it could not be done. I take it Mr. John [the Assistant District Attorney] wants to show the jury that it can be done." Defense counsel then said: ". . . she has testified that she was on the table with her hands on the table and her head down on her hands. If Your Honor wants that kind of a demonstration or would allow such a demonstration before the jury—I can't conceive of it—I object to it on the ground that it doesn't fairly reproduce or represent the conditions that existed. If we are going to have a demonstration, then we personally would welcome it and I debated whether I ought to ask permission to have such a thing and I rejected it. If we want to, we will be glad to bring the table here and let us have a real demonstration so the jury can see." The Court said: "I will permit the demonstration." Defendant's counsel stated: "Well, Your

Honor will do it, of course, over my objection and Your Honor will let the record show there is an objection to it." The Court: "Yes. I grant you an exception." Defense counsel: "I regard it as highly inflammatory." The Court: "There is nothing inflammatory. There is a question whether the human body can get down that way or whether it can't." Defense counsel: "Sir, I regard it as highly inflammatory to the jury, highly prejudicial and most indecent, sir." The Court: "There is nothing indecent about it. The young woman will keep on her clothes. There is absolutely nothing indecent." Defense counsel: ". . . will Your Honor let the record show that this is over my most strenuous objection, which Your Honor has overruled and allows an exception?" The Court: "I have allowed you an exception, Mr. Schofield. I did that before you repeated your objection." Mr. Schofield: "If Your Honor please, I would like the record to show the condition that the prosecutrix is in, her violent sobbing, her evident hysteria." The Court: "I will state for the record there is no violent sobbing. The witness called upon to do this is sobbing but not violently, in any event. That is for the jury and whether the jury thinks that creates any situation is something I should regard as for the jury." The District Attorney then said to the prosecutrix: "Get up on the table and show us, please." The prosecutrix did as requested. The Court: "Members of the jury, you will observe how close her body comes." [2] Assistant District Attorney: "Three inches". Defense counsel then said: "I would like the record to show . . . this prosecutrix is sobbing most violently so that it could be heard in all parts of the courtroom, and I have no doubt through the doors and corridors. That is what I call a violent demonstration of emotion, calculated to inflame the jury . . . I now ask, because of the great harm and irreparable damage

---

[2] The Assistant District Attorney also took certain measurements with a ruler.

done to the defendant, for the withdrawal of a juror."
The Court: "I refuse the motion and I will state that
very definitely there was no such violent demonstration
as Mr. Schofield states. The witness was sobbing, but
not loudly."

There are at least four reasons why this exhibition
in the court room deserves judicial condemnation.

First. It was a totally unnecessary impropriety. The
jury could have judged of the trustworthiness of Mrs.
Valenti's testimony without any such realism. When
Blackstone in extolling trial by jury pictured its
"ancient dignity" he certainly did not have in mind any
such pelvic posturing as was permitted in the trial of
this case. The goddess of Justice is not prurient.

Second. Whether Mrs. Valenti was, during the exhibi-
tion, "sobbing violently", as defendant's counsel says she
was, or merely "sobbing", as the trial judge said she was,
the scene was one calculated to create an atmosphere of
emotion unsuitable to the due administration of justice.
It was prejudicial both to the prosecutrix and to the
defendant.

Third. It was unfair to the prosecutrix to compel [3]
her to be the central figure of a vulgar exhibition. The
interests of justice never requires human beings to sub-
mit to such indignity. No self-respecting man would
willingly permit his mother, his wife, his sister, or his
daughter to be subjected to such a crude indelicacy in
the presence of a judge, a court stenographer, and of
counsel and a jury of men and women.[4]

---

[3] What the District Attorney said to Mrs. Valenti with the
acquiescence of the Trial Judge was doubtless interpreted by her as a
command.

[4] It appears from the judge's charge that the performance was
"out of sight of the rest of the courtroom". What kind of "curtain"
was used to screen the scene from other willing onlookers is not
disclosed.

Fourth. Most women are reluctant to make a complaint in rape cases because they naturally dread the resulting notoriety. If it is known that a woman who makes a charge of rape may be compelled in the court room to pantomime the attack, few rape cases will be reported and many rapists will go unpunished.

In *Guhl v. Whitcomb et al.*, 85 N.W. 142, the Supreme Court of Wisconsin said, in respect to the reception in evidence of photographs showing the rear view of a plaintiff's person, nude from below the shoulders to mid-thigh: "Such photographic exposure of the body of a 20 year old girl in a court room full of men is even more grossly improper and shocking than the conduct disclosed in Brown V. Swineford, 44 Wis. 282, 285, of which this court expressed its condemnation in the scathing words of Chief Justice RYAN: 'No such indecency is ever necessary, or should be tolerated, in court. If the condition of any private part of the body of any party, male or female, is material on any trial, it should be privately examined by experts out of court, and expert testimony be given of it. Such an exposure as was made in this case, if made without leave of the court, might well be punished as a contempt. Made with the sanction of the court, it is none the less improper and indecent, well calculated to disgrace the administration of justice, and to bring it into ridicule, if not into contempt.' "

In *Garvik v. Burlington, C. R. & N. Ry. Co.*, 100 N.W. 498 (a rape case), the Supreme Court of Iowa condemned in equally strong language the trial judge's permitting in court an examination of the defendant's genitals, saying, inter alia, "we cannot lend our support to such a shocking and indecedent performance as was permitted in this case".

The fourth assignment of error is sustained.

This is the eleventh assignment of error: "11. The . . . Judge erred in charging the jury as follows: 'Now, it has been stated to you that if the husband, either

then or at any other time, had been told that this defendant had raped his wife he would have grabbed the defendant by the throat and slugged him, and we would all have patted him on the back for it. I say to you, members of the jury, if he had done any such thing he would have committed a crime and he could have been brought in court for assault and battery on this defendant. The law does not permit a husband to go and indulge in any such antics.' "

This comment of the trial judge was proper. The husband when told of the alleged rape on his wife acted as a law abiding citizen should act instead of taking the law into his own hands and chastising the alleged attacker. Undoubtedly there are husbands who under like provocation would visit dire retribution on the accused, but no argument against the truthfulness of Mrs. Valenti's testimony can be predicated on the fact that the husband was satisfied to set in motion legal processes. Possibly the husband's training in the armed forces intensified a natural respect for the disciplines of the law.

Both the Superior Court and the trial court correctly held that the verdict in this case was not against the weight of the evidence and that there was nothing in the conduct of Mrs. Valenti, after she discovered that her confidence in her physician had been abused and her person violated, which stamped suspicion either on the charge she made or on the trustworthiness of her testimony. Women who are violated as Mrs. Valenti claims she was may be divided into three classes: (1) those who furiously turn on their attacker with any weapon available or even with their bare hands; (2) those who because of a natural dread of having the indignity publicized, remain silent; and (3) those who, after counselling for a day or two with husband and friends, invoke the law. Mrs. Valenti apparently belongs to the latter class. The members of all the classes are entitled to respect.

The judgment is reversed with a venire.