# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 13-2273

CLYDE MCKINNEY, JR., APPELLANT,

V.

ROBERT A. MCDONALD,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 2, 2015                           Decided March 11, 2016)

*Landon E. Overby* of Providence, Rhode Island, with whom *Kenneth L. LaVan* of Fort Lauderdale, Florida, was on the brief, for the appellant.

*Ronen Z. Morris* and *Carolyn F. Washington*, with whom *Leigh A. Bradley*, General Counsel; and *Mary Ann Flynn*, Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before DAVIS, SCHOELEN, and BARTLEY *Judges*.

SCHOELEN, *Judge*, filed the opinion of the Court. BARTLEY, *Judge*, filed an opinion joining in part, concurring in part, and dissenting in part.

SCHOELEN, *Judge*: Clyde McKinney, Jr., appeals through counsel an April 10, 2013, Board of Veterans' Appeals (Board) decision that denied disability compensation for (1) a respiratory disorder to include as due to asbestos exposure, (2) bilateral hearing loss, and (3) tinnitus.[1] Record (R.) at 3-21. This matter was referred to a panel of the Court, with oral argument, to address whether the hearing loss noted on Mr. McKinney's entrance examination was a preexisting disability under

---

[1] Mr. McKinney does not raise any argument concerning the Board's denial of disability compensation benefits for tinnitus. *See* Appellant's Brief (Br.). Accordingly, the Court finds that Mr. McKinney has abandoned this claim on appeal and the Court will dismiss the appeal as to this claim. *See Pederson v. McDonald*, 27 Vet.App. 276, 285 (2015) (en banc) (dismissing appeal as to issues abandoned by a represented appellant); *Cacciola v. Gibson*, 27 Vet.App. 45, 48 (2014) (noting that "when an appellant expressly abandons an issue in his initial brief or fails to present any challenge and argument regarding an issue, the abandoned issue generally is not reviewed by the Court").

38 U.S.C. § 1111.[2]  For the following reasons, the Board's decision will be vacated and the matters remanded for further adjudication.

## I. HEARING LOSS

### A. Background

Mr. McKinney served on active duty in the U.S. Navy as a boatswain's mate from April 1969 to April 1971.  As part of an entrance medical examination, he underwent a January 1969 audiometric test to assess his hearing acuity.[3]  His puretone thresholds, in decibels, were recorded in the medical report as follows:

| | HERTZ | | | | |
| --- | --- | --- | --- | --- | --- |
| | **500** | **1000** | **2000** | **3000** | **4000** |
| **RIGHT** | 5 | 5 | 5 | N/A | 35 |
| **LEFT** | 5 | 0 | 15 | N/A | 35 |

R. at 897.  Block 74, on the second page of the medical report, is reserved for a medical examiner to provide a "SUMMARY OF DEFECTS AND DIAGNOSES," discovered during the entrance examination.  *Id.*  The only "defect or diagnosis" the examiner noted in block 74 was defective vision.  *Id.*  On this same page, block 76 contains a physical profile (PULHES) report, which reflects the results of a rating system used by the military to evaluate a servicemember's physical health upon entrance into and separation from service.  *See McIntosh v. Brown*, 4 Vet.App. 553, 555 (1993). "PULHES" is an acronym that represents the profile's six categories: "P" stands for "physical capacity or stamina"; "U" stands for "upper extremities"; "L" stands for "lower extremities"; "H"

---

[2] Oral argument was held on April 2, 2015, at William and Mary Law School in Williamsburg, Virginia.  The Court extends its appreciation to the law school for its hospitality.

[3] An audiometric test measures threshold hearing levels (in decibels (dB)) over a range of frequencies (in Hertz (Hz)).  In *Hensley v. Brown*, 5 Vet.App. 155, 157 (1993), this Court stated that "the threshold for normal hearing is from 0 to 20 dB, and higher thresholds levels indicate some degree of hearing loss."

stands for "hearing and ear"; "E" stands for "eyes"; and "S" stands for "psychiatric." Para. 9-3(b)(1)-(6), Army Regulation (AR) 40-501 (Feb. 20, 1962).

A profile serial is assigned on a scale of 1 to 4 for each of the six categories, with "1" indicating the highest level of fitness.[4] Under "H" a "1" is assigned if the decibel level at 4000 Hz does not exceed 40. Appendix (App'x) VIII to Para. 9-3(b), AR 40-501. Mr. McKinney was assigned a "2" for his vision, but he received a "1" in the other PULHES categories.[5] Mr. McKinney apparently was assigned a "B" on his PULHES report because of his vision, indicating that he "may have minor impairment under one or more PULHES factors which disqualify him or her for certain critical MOS [military occupation specialties] training or assignment" but "no significant limitation" and is considered "combat fit."[6] Para. 9-5, AR 40-501. Notwithstanding the "B" assignment on his entrance examination, the Navy determined that Mr. McKinney's hearing impairment was minor and caused "no significant limitation" in his ability to perform most Navy jobs. *Id.*

Mr. McKinney was not treated for hearing loss during service nor was a hearing examination conducted as part of his separation examination. R. at 899-900. In April 2009, Mr. McKinney filed a claim for disability compensation for bilateral hearing loss asserting that he was exposed to artillery fire in training missions and noise from helicopters. R. at 877; *see also* R. at 155-56. In May 2011, a VA hearing examiner reviewed Mr. McKinney's 1969 audiology test results and opined that he had "a pre-existing hearing loss at 4000 Hz, bilaterally" and that "[a]ll other thresholds tested were within normal limits." R. at 108. After reviewing the results of a current VA audiological examination, the VA examiner diagnosed Mr. McKinney with bilateral hearing within normal limits between 250 and 1000 Hz with sloping bilateral hearing loss at 200 to 8000 Hz. R. at 107.

---

[4] A person who receives a numerical designation of "1" under all categories, is considered to "possess a high level of physical and mental fitness and is medically fit for any military assignment." Para. 9-3(c)(1), AR 40-501.

[5] A person, such as Mr. McKinney, with a physical profile of "2" under any of the categories, meets the medical entry standards, but "possesses some medical condition [or] physical defect[,] which may impose some limitation on his military occupation classification and assignment." Para. 9-3(c)(2), AR 40-501.

[6] In addition to the numerical classifications from 1 to 4, alphabetical designations are assigned to the various physical categories "with respect to their organic functional ability." Para. 9-7, AR 40-501.

An audiometric test performed in conjunction with the May 2011 examination showed puretone thresholds, in decibels as follows:

| | HERTZ | | | | |
|---|---|---|---|---|---|
| | **500** | **1000** | **2000** | **3000** | **4000** |
| **RIGHT** | 5 | 25 | 40 | 55 | 55 |
| **LEFT** | 0 | 15 | 30 | 50 | 45 |

*Id.* The hearing examiner stated that because no audiometric test was performed as part of Mr. McKinney's separation examination, she could not offer an opinion "regarding a hearing loss, or hearing threshold shift bilaterally . . . without resorting to speculation." R. at 108.

In June 2009, the VA regional office (RO) denied the claim. R. at 1141-44. In March 2012, an addendum was added to the May 2011 hearing examination report. R. at 96. The examiner stated that she could not offer an opinion regarding the effect of in-service noise exposure on Mr. McKinney's hearing without resorting to speculation. *Id.* Mr. McKinney appealed the decision to the Board. R. at 829-31.

On April 10, 2013, the Board issued the decision here on appeal. R. at 3-21. In denying the hearing loss claim, the Board found that Mr. McKinney was not entitled to the presumption of soundness because his military service entrance audiometric test showed that he had "some degree of preexisting hearing loss." R. at 16. In reaching this determination, the Board relied on *Hensley, supra*, to conclude that because Mr. McKinney's entrance audiometric test revealed that the puretone threshold at 4000 Hz was outside the range of normal hearing, he had some degree of hearing loss when he entered service. R. at 16-17.

The Board stated that because the VA hearing examiner's statement did not provide an opinion regarding aggravation or the etiology of Mr. McKinney's hearing loss, the statement "provides neither positive nor negative support for service connection." R. at 19. Because there was "no other competent medical opinion evidence addressing the etiology of [Mr. McKinney's] hearing loss," the Board concluded that his preexisting hearing loss was not incurred or aggravated

by service. *Id.* However, the Board found that Mr. McKinney's statements that he was exposed to loud noise during service were competent, credible, and consistent with the circumstances of his service. R. at 18.

## B. Parties' Arguments

Mr. McKinney argues that the Board erred when it determined that his military entrance examination showed that he had a preexisting hearing loss. Appellant's Br. at 16-20. The appellant has alternately stated that his entrance medical examination showed that he had "imperfect" hearing, "abnormal hearing impairment," and a "decibel loss." Appellant's First Supplemental Memorandum of Law at 7; Oral Argument Recording at 9:57, 15:04, 18:59. Nevertheless, he argues that because the degree of hearing loss noted on his entrance examination did not constitute a hearing disability under 38 C.F.R. § 3.385 (2015), the Board erred when it concluded that he had a preexisting hearing loss. Appellant's Br. at 16-20; Appellant's Second Supplemental Memorandum of Law. Additionally, at oral argument, Mr. McKinney argued that the fact that the Navy did not find that his hearing loss prevented him from serving is further proof that he did not have a preexisting hearing loss for VA purposes. Oral Argument Recording at 15:04.

The Secretary argues that the Board properly denied Mr. McKinney's claim because the hearing loss noted on his entrance examination showed that he had a preexisting condition, and the Board's determination that his hearing loss was not aggravated by service is plausible. Secretary's Br. at 20-21. In response to the appellant's § 3.385 argument, the Secretary asserts that this regulation is irrelevant to the presumption that he was in sound condition when he entered service because § 3.385 establishes when a hearing loss is a disability solely for the purpose of payment of disability compensation benefits. Secretary's Br. at 18-19.

## C. Analysis

### 1. Presumption of Soundness

Because the degree of hearing loss noted on Mr. McKinney's entrance medical examination (35 dB at 4000 Hz in both ears) did not meet VA's definition of a "disability" for hearing loss under 38 C.F.R. § 3.385, the Court holds that Mr. McKinney was entitled to the presumption of soundness under section 1111. The Court reaches this conclusion after considering certain related statutory and regulatory provisions governing VA disability compensation.

Section 1110 sets forth the basic entitlement to disability compensation and provides that the Secretary will compensate a veteran "[f]or disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty."[7] Thus, under section 1110, a claim for disability compensation may not be granted unless a disability results from a disease or injury that was incurred or aggravated during service. *See Terry v. Principi,* 340 F.3d 1378, 1382 (Fed. Cir. 2003) (stating that section 1110 makes "clear that if a disability cannot be attributed to an injury or a disease incurred or aggravated in the line of duty, the disability is not compensable"). "Disability" as used in section 1110 refers to "impairment of earning capacity due to disease, injury, or defect, rather than to the disease, injury, or defect itself." *Allen v. Brown*, 7 Vet.App. 439, 448 (1995) (en banc); *Hunt v. Derwinski*, 1 Vet.App. 292, 296-97 (1991). After VA determines that a veteran has a current disability resulting from a disease or injury that is related to service, the disability is evaluated under the disability rating schedule, and the payment of monetary benefits is tied to the percentage rating assigned to the veteran's disability. *See* 38 C.F.R. § 4.1 (2015) ("The percentage ratings represent . . . the average impairment in earning capacity resulting from . . . disease and injuries and their residual conditions in civilian occupations.").[8]

Determining for disability compensation purposes whether a disease or injury is related to service often raises the question whether the disease or injury arose during service or preexisted the veteran's military service. Section 1111 provides a framework for making this determination and provides that a veteran who claims entitlement to disability compensation under section 1110 is

[7] Section 1110 provides:

> For disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, or air service, during a period of war, the United States will pay to any veteran thus disabled and who was discharged or released under conditions other than dishonorable from the period of service in which said injury or disease was incurred, or preexisting injury or disease was aggravated, compensation as provided in this subchapter, but no compensation shall be paid if the disability is a result of the veteran's own willful misconduct or abuse of alcohol or drugs.

[8] Because the impairment in earning capacity is the basis for disability evaluations, VA must consider the effect of the appellant's disability on his ability "to function under the ordinary conditions of daily life, including employment." 38 C.F.R. § 4.10 (2015). Therefore, when assigning a disability rating VA must consider the disability "from the point of view of the veteran working or seeking work." 38 C.F.R. § 4.2 (2015).

entitled to a presumption that he or she was in sound condition upon entry into service "except as to defects, infirmities, or disorders noted" during an entrance examination. Section 1111 specifically references section 1110 and states:

> For the purposes of section 1110 of this title . . ., every veteran shall be taken to have been in sound condition when examined, accepted, and enrolled for service, *except as to defects, infirmities, or disorders* noted at the time of the examination, acceptance, and enrollment, or where clear and unmistakable evidence demonstrates that the injury or disease existed before acceptance and enrollment and was not aggravated by such service.

38 U.S.C. § 1111 (emphasis added).

Therefore, when no preexisting medical condition is noted upon entry into service, a veteran is presumed to have been sound in every respect. *See Wagner v. Principi*, 370 F.3d 1089, 1096 (Fed. Cir. 2004); *Horn v. Shinseki*, 25 Vet.App. 231, 234 (2012); *Bagby v. Derwinski*, 1 Vet.App. 225, 227 (1991). Critical to determining whether a defect, infirmity, or disorder has been "noted" is whether the condition is "recorded" in an examination report. 38 C.F.R. § 3.304(b) (2015). Noting only a history of a condition at the time of the entrance examination "does not constitute a notation" of a preexisting condition. 38 C.F.R. § 3.304(b)(1); *see Crowe v. Brown*, 7 Vet.App. 238, 245 (1994) (noting that the presumption of soundness only attaches "where there has been an induction examination in which the later-complained-of-disability was not detected").

If a veteran is entitled to the presumption, the burden then falls on VA to rebut the presumption by clear and unmistakable evidence that the injury or disease manifested in service was *both* preexisting and not aggravated by service. *See* 38 U.S.C. § 1111 (the Secretary's burden is derived from the phrase "or where clear and unmistakable evidence demonstrates that the injury or disease existed before acceptance and enrollment and was not aggravated by service"); *Wagner*, 370 F.3d at 1096; *Horn*, 251 Vet.App. at 234; *Bagby*, 1 Vet.App. at 227.

Conversely, when a medical condition is noted during an entrance examination and a veteran claims that the preexisting condition was aggravated during service, a related but different statutory provision is applicable: Section 1153, title 38, U.S. Code, provides that "[a] preexisting injury or disease will be considered to have been aggravated by active military . . . service, where there is an increase in disability during such service, unless there is a specific finding that the increase in disability is due to the natural progress of the disease."

7

The Court concludes that Mr. McKinney had preexisting hearing loss that was "noted" on his 1969 entrance examination. Our concurring colleague would find that no hearing loss was "noted" on Mr. McKinney's entrance examination because, although the audiological thresholds indicating hearing loss were recorded at the time of the 1969 service entrance examination, there was no contemporaneous medical opinion interpreting the significance of those thresholds. However, we find that the contemporaneous recording of an auditory examination threshold above 20 dB at 4000 Hz at service entrance was sufficient to constitute a "notation" of a hearing defect even without a contemporaneous medical examination interpreting the significance of those results.

In *Hensley v. Brown*, the Court, relying on a particular medical treatise, recognized that puretone hearing thresholds above 20 dB "indicate some degree of hearing loss." 5 Vet.App. at 157. *Hensley*'s recognition of this medical standard provided the Board with a basis for discerning the significance of the contemporaneously recorded 1969 audiology test results. *See* R. at 16 (Board citing *Hensley* for the proposition that hearing thresholds greater than 20 dB "indicate some degree of hearing loss"). Because the presence of hearing loss is based on an objective standard, the Board is easily able to identify hearing loss that is revealed on an audiometric test.

We agree with our concurring colleague's observation that *Hensley* did not address what constitutes a notation under section 1111 and § 3.304(b) because the naval examiner, relying on audiometric tests, concluded that Mr. Hensley had defective hearing. However, by explaining the medical basis for the naval examiner's interpretation of the audiometric test results, *Hensley* provided the Board in this case with a foundation for determining that the 1969 audiometric test revealed that Mr. McKinney had abnormal hearing at 4000 Hz.

Even if there were some question as to the significance of the 1969 audiometric test results, the record included the May 2011 VA hearing examiner's report opining that the 1969 audiology test showed that Mr. McKinney had abnormal hearing at 4000 Hz. This report provided additional evidence that the medical standard adopted in *Hensley* was an accurate barometer for gauging the presence of hearing loss. Significantly, Mr. McKinney challenges neither the medical standard for abnormal hearing announced in *Hensley* nor the 2011 VA hearing examiner's use of that standard in rendering her opinion that Mr. McKinney had abnormal hearing at 4000 Hz. Given the Board's

8

reliance on *Hensley*, it is unclear how our concurring colleague reached the conclusion that the temporal requirement of noting a defect, infirmity, or disorder at entry is not fulfilled in this case.

It is also perplexing that our concurring colleague concludes that Mr. McKinney's entrance examination was not "out of the ordinary" simply because the naval examiner did not state that Mr. McKinney had defective hearing, *post* at 28. In point of fact, it is not surprising that the naval examiner did not note defective hearing. The 1969 audiology report reveals that at 4000 Hz, Mr. McKinney's hearing acuity was 35 dB bilaterally, denoting some degree of bilateral hearing loss. However, because his hearing acuity was below 40 dB bilaterally, he was assigned a "1" under the PULHES rating system, denoting the highest degree of fitness for hearing. App'x VIII to Para. 9-5, AR 40-501. This designation means only that Mr. McKinney's hearing did not, at that time, constitute a condition that "may impose some limitation on his military occupation classification and assignment." Para. 9-3(c)(2), AR 40-501. Under the PULHES rating system, he was considered highly fit despite the presence of some degree of hearing loss. In other words, the abnormal 1969 audiological test result simply was not significant to the military at the time of its recording; the result became significant to Mr. McKinney only when he applied for disability benefits. Hence, unlike our concurring colleague, the majority finds no basis for attaching significance to the fact that the naval examiner does not expressly state that Mr. McKinney's hearing was defective. Thus, the majority concludes that preexisting hearing loss was noted on Mr. McKinney's entrance examination.

Nonetheless, whether Mr. McKinney's preexisting hearing loss means that he was not entitled to the presumption of soundness may not be resolved without reviewing VA's regulation defining hearing loss as a disability.

### 2. Hearing Loss as a Disability

In addition to the statutory provisions discussed above, the Court must consider 38 C.F.R. § 3.385, which defines "what constitutes a hearing disability." 55 Fed. Reg. 12,348 (Apr. 3, 1990). In *Hensley*, the Court recognized that, on an audiometric test, puretone thresholds above 20 dB may constitute hearing loss, even though such hearing loss may not constitute a "disability" under § 3.385 for VA benefits purposes. 5 Vet.App. at 157. Under the VA disability scheme, the Secretary has "authority to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by [VA] and are consistent with those laws."

9

38 U.S.C. § 501(a)(1). This authority includes permission to establish "regulations with respect to the nature and extent of proof and evidence . . . to establish the right to benefits under such laws." Pursuant to this rulemaking authority, the Secretary implemented 38 C.F.R. § 3.385, which states that impaired hearing is considered a "disability for compensation purposes" when the "audiometry threshold in any of the frequencies 500, 1,000, 2,000, 3,000, 4,000 [Hz] is 40 [dB] or greater; or when audiometry thresholds for at least three of the frequencies 500, 1,000, 2,000, 3,000, or 4,000 [Hz] are 26 [dB] or greater; or when speech recognition scores using the Maryland CNC Test are less than 94[%]." Thus, the regulation provides that unless the impaired hearing meets these minimum thresholds, it is not a "disability" under section 1110.[9]

In *Palczewski v. Nicholson*, 21 Vet.App. 174, 177-79 (2007), the Court inquired whether § 3.385 represents the Secretary's "interpretation and refinement of the term 'disability' referred to in 38 U.S.C. § 1110"; and the Court concluded that the regulation reasonably interpreted what constitutes a hearing disability. The Court noted that when the Secretary promulgated § 3.385, he stated that "'the purpose of the regulation is to provide a gauge of what constitutes a hearing disability.'" 21 Vet.App. at 178-79 (quoting 55 Fed. Reg. 12,348 (Apr. 3, 1990)). Generally, once VA determines that a veteran has a disease or injury that was incurred or aggravated by service, service connection is granted for the resulting disability without regard to its severity. The severity of the disability is usually considered only after service connection has been granted and VA is assigning a disability rating to compensate the veteran for the impairment in earning capacity attributed to the disability.

Hearing loss is an exception to this rule. Because hearing loss is not considered a "disability" unless the loss exceeds a certain threshold on an audiometric test, a minimum degree of hearing loss is a prerequisite for entitlement to disability compensation benefits. Indeed, the Secretary explained in the *Federal Register* that "a change in hearing as a result of military service is a disability only if it exceeds the specified levels" in the regulation. 55 Fed. Reg. 12,348. The Secretary also stated that § 3.385 applies *before* a determination regarding service connection is made. *Id.* (emphasis added). This interpretation means that if a veteran's hearing loss is not a "disability" under § 3.385, there is

---

[9] This regulation reflects a determination by the Secretary that certain degrees of hearing loss are not considered disabilities because they do not result in an impairment in earning capacity.

no need for VA to determine whether the hearing loss is related to service because no entitlement to disability compensation exists if the hearing loss falls below the minimum standards. Thus, contrary to the Secretary's argument, § 3.385 affects more than the payment of disability compensation benefits. Instead, the regulation establishes when hearing loss constitutes a disability for entitlement to disability compensation benefits. *See Hensley*, 5 Vet.App. at 157. If the veteran's hearing loss does not meet the standards under § 3.385, he or she is denied disability compensation benefits for hearing loss.

### 3. Winn *and* Terry

It is these statutory and regulatory provisions that the Court must consider to resolve the issue before it. The information on an entrance medical examination is a key to resolving whether a claimant is entitled to the presumption of soundness. When an entrance medical examination reveals that a veteran has any "defects, infirmities, or disorders," the noted condition is considered to have preexisted service. The Secretary focuses his argument on the ordinary meaning of the term "defect," which he contends is broad and includes virtually *any* imperfection that is noted on an entrance examination.[10] *See* Secretary's Memorandum of Law at 2; Oral Argument Recording at 38:53-39:11, 50:03-51:33. In this vein, he argues that the Board properly determined that Mr. McKinney had a "defect" noted on his entrance examination because he had some degree of hearing impairment. Oral Argument Recording at 38:53-39:11, 50:03-51:33. On initial consideration, the Secretary's argument seems persuasive.

The persuasiveness of this argument, however, is diminished when the Court considers relevant precedent from this Court and the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) interpreting the statutory term "defects" used in section 1111. In *Winn v. Brown*, 8 Vet.App. 510, 515 (1996), this Court interpreted "defects" as it applied to personality disorders. Under 38 C.F.R. § 3.303(c) (2015), "[c]ongenital or developmental defects, refractive error of the eye,

---

[10] The Secretary notes that even if "defect" does not include any and every abnormal or deviant characteristic, "infirmities" and "disorders" are also broadly defined and the inclusion of all three terms in the statute shows a broad congressional intent that these terms be construed in a manner similar to the way "defect" is construed. Secretary's Memorandum of Law at 2. The Court notes that "infirmity" is defined as "the quality or state of being infirm," which, in turn, is defined as "of poor or deteriorated vitality" or a "state of being feeble." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 598 (10th ed. 1999). Finally, a "disorder" is "an abnormal physical or mental condition." *Id.* at 334.

personality disorders and mental deficiency . . . are not diseases or injuries within the meaning of applicable legislation." Mr. Winn was seeking disability compensation benefits for a personality disorder that was *not* noted on an entrance examination. He argued that he was entitled to the statutory presumption of soundness and that the Secretary needed to produce clear and unmistakable evidence that his personality disorder preexisted service and was not aggravated by service. Additionally, he argued that 38 C.F.R. § 3.303(c) was invalid because it was inconsistent with the plain language of section 1111.

Because "defects," is not defined in the statute, the Court in *Winn* applied the fundamental canon of statutory construction that the words of a statute are given their ordinary, contemporary, common meaning. *Winn*, 8 Vet.App. 515-16. In doing so, the Court examined the ordinary meaning of "defect," which the Court noted is defined as an "imperfection that impairs worth or utility" or a "lack of something necessary for completeness, adequacy, or perfection." *Id.* at 516 (quoting NEW WORLD DICTIONARY 333 (3d ed. 1988)); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) (stating that "unless otherwise defined, words [in a statute] will be interpreted as taking their ordinary, contemporary, common meaning"); *McGee v. Peake*, 511 F.3d 1352, 1356 (Fed. Cir. 2008); *Trafter v. Shinseki*, 26 Vet.App. 267, 284 (2013). The Court observed that "defect" is defined broadly, that its ordinary meaning is "virtually unlimited." *Winn*, 8 Vet.App. at 516. Hence, the Court stated that "everyone [] has a defect" because no one is perfect. *Id.*

However, the Court concluded that Congress did not intend "defect"as used in section 1111 would have this broad meaning. *Id.* Hence, the Court considered not only the bare meaning of word "defect" but also the placement and purpose of that word in the statutory scheme. *See Winn*, 8 Vet.App. at 515-16; *see also Holloway v. United States,* 526 U.S. 1, 6 (1999) (the Court must "consider not only the bare meaning of the critical word or phrase 'but also its placement and purpose in the statutory scheme.'" (quoting *Bailey v. United States,* 516 U.S. 137, 145 (1995)). Upon such consideration, the Court in *Winn* observed that section 1111 (creating the presumption of soundness), in which the term "defect" appears, is closely connected to section 1110 (creating entitlement to disability compensation for disabilities resulting from disease or injury incurred or aggravated in service). 8 Vet.App. at 515-16. Significantly, to determine the meaning of "defect," the Court linked the statutory term "defect" in section 1111 with the phrase in section 1110, "disability resulting from

12

personal injury . . . or disease." Because of the close connection between these statutory provisions, *Winn* stated that "the language of [section] 1111 must be read in connection with [section] 1110 on which [it] is conditioned." *Id.* at 516.

Reading these two provisions in conjunction, the Court held that "defect" could not be construed broadly as the ordinary meaning of that term encompasses *any* imperfection. *Id.* Rather, the Court stated that the term "'defect' in section 1111 necessarily means a defect that amounts to or arises from a disease or injury" resulting in a disability authorized by section 1110. *Id.* Thus, *Winn*'s interpretation of "defect" is based on the existing correlation between that word in section 1111 and the phrase in section 1110 providing that VA will pay compensation for any disability resulting from personal injury or disease contracted in or aggravated by service. Because § 3.303(c) provides that "a personality disorder . . . is not the type of disease or injury-related defect" recognized by VA, the Court concluded that the presumption of soundness did not "apply" to Mr. Winn's claim, even though his personality disorder was not noted on his entrance examination.[11] *Id.* By construing the term "defect" narrowly, the Court stated that its interpretation "is internally consistent with section 1111 and consistent with the title 38 statutory scheme as a whole." *Id.*

In *Terry v. Principi*, 340 F.3d 1378 (Fed. Cir. 2003), the Federal Circuit embraced this Court's interpretation of "defect." Mr. Terry argued that the exclusion of refractive error of the eye from "disease or injury" in § 3.303(c) violated sections 1110 and 1111. The Federal Circuit held that the Secretary's interpretation of "injury" or "disease" adopted in § 3.303(c) was a permissible construction of those statutory terms. *Id.* at 1384. Like this Court in *Winn,* the Federal Circuit rejected Mr. Terry's argument that the terms "defects, infirmities, or disorders" should be broadly construed. The Federal Circuit explicitly followed *Winn*'s holding that "defect" should be read narrowly to include only those defects that VA considers to "'amount[] to or arise[] from a disease or injury.'" *Id.* at 1385-86 (quoting *Winn*, 8 Vet.App. at 516). Thus, *Terry* and *Winn* did not apply the ordinary meaning of "defect" in section 1111 because the courts in these decisions concluded that the ordinary meaning of that term is not consistent with the statutory and regulatory scheme governing disability compensation for veterans. In sum, *Winn* and *Terry* stand for the proposition

_____

[11] The Court also determined that the regulation did not conflict with section 1111 as VA might properly exclude personality disorders from the category of diseases from which a "disability" might arise. 8 Vet.App. at 516.

that when VA, by regulation, provides that disability compensation is not permitted under section 1110 for a particular condition, the excluded condition can never amount to a "defect" within the meaning of section 1111.

### 4. *Application of* Winn *and* Terry

The interpretation by *Winn* and *Terry* of "defect" used in section 1111 guides this Court's interpretation of that statutory term as it applies to hearing loss. When the Secretary promulgated § 3.385, he took an approach different from the one he adopted when he promulgated § 3.303(c). Unlike personality disorders or refractive errors, hearing loss is not excluded from the category of diseases and injuries under section 1110 for which disability compensation may be awarded. However, the Secretary's exclusion of certain levels of hearing impairment from consideration as disabilities restricts disability compensation benefits for hearing loss. Just as *Winn* and *Terry* interpreted "defect" narrowly to exclude conditions that might not result in disabilities under section 1110, the Court holds that "defect" should be narrowly interpreted so that it does not encompass a level of hearing impairment that is not considered a "disability" under § 3.385.

The Court is not persuaded by the Secretary's contentions at oral argument that the appellant's reliance on *Winn* and *Terry* is misplaced because those cases involved claimants who did not have any defects, infirmities, or disorders noted on their entrance examinations. In making this argument, the Secretary fails to recognize that *Winn* and *Terry's* narrow interpretation of "defect" was not based on the fact that the claimants' personality disorder and refractive error were not noted on their entrance examinations. Rather, *Winn* and *Terry* narrowly interpreted "defect" because VA prohibits disability compensation benefits for personality disorders and refractive errors. It is this rationale that the Court applies here to hold that when the level of hearing loss noted on an entrance examination does not meet VA's definition of a hearing "disability," that level of hearing loss is not a "defect."[12] If in this case the Court were to adopt the Secretary's argument, and construe "defect" broadly to conclude that any level of hearing loss is a "defect," the Court would have to disregard the holdings in *Winn* and *Terry*. Morever, in following the Secretary's suggestion, the meaning of

---

[12] Although the focus of the parties was on "defect," because the meaning of "defects," "infirmities," and "disorders" (as discussed in footnote 10) are broad and overlapping, the Court concludes that the same rationale for interpreting "defect" narrowly applies equally to "infirmities" and "disorders."

"defect" under section 1111 would vary from case to case. Hence, a "defect" would be given a broad or narrow interpretation depending upon whether the "defect" was or was not noted on an entrance examination. The Court will not follow this suggestion. We shall interpret the term "defect" consistently under either scenario. *See Clark v. Martinez*, 543 U.S. 371 (2005) (holding that giving different meanings to the same statutory phrase "would be to invent a statute rather than interpret one"). In either case, a determination as to whether a "defect," under section 1111, is or is not noted on an entrance examination will be based on whether disability compensation benefits are available for the condition for which the veteran seeks benefits.

### 5. Absurd Result

The Secretary also argued that because Mr. McKinney's preexisting hearing loss was a "defect" under section 1111, the Board properly treated his claim as a claim for aggravation of a preexisting disability under 38 U.S.C. § 1153. Secretary's Br. at 20-21. At oral argument, Mr. McKinney argues that this is not possible. Oral Argument Recording at 56:41-59:02; *see also* Appellant's Second Supplemental Memorandum of Law at 4-5. He points out that pursuant to section 1153, a preexisting injury or disease is considered to have been aggravated "where there is an increase in *disability* during service" (emphasis added). He contends that under the Secretary's interpretation of section 1111, a claimant with hearing loss noted on entrance that does not meet the criteria of § 3.385, may not establish aggravation because the claimant's preexisting hearing impairment would not be a "disability." Therefore, the claimant *could* not demonstrate that there was an "increase in disability." In light of the Court's discussion above that hearing loss that does not meet the requirements of § 3.385 is not a "defect" because it is not considered a disability for VA purposes, the Court agrees with Mr. McKinney and finds that the Secretary's interpretation of "defect" would produce the absurd result described by Mr. McKinney. Morever, because the Secretary's interpretation of "defect" fails to consider the overall disability compensation scheme pertaining to hearing loss, the Court is not persuaded by his interpretation. In sum, the Court holds that the hearing loss noted on Mr. McKinney's entrance medical examination was not a "defect, infirmity, or disorder." Thus, the Board erred in concluding that Mr. McKinney was not entitled to the presumption of soundness. The Board's determination is reversed.

*6. The Board erred in relying on the May 2011 hearing examiner's opinion to deny*
*Mr. McKinney's claim.*

After concluding that Mr. McKinney was not entitled to the presumption of soundness, the Board denied his claim on the basis that no competent medical evidence established a causal relationship between Mr. McKinney's hearing loss and service. R. at 18-19. In doing so, the Board noted that the only medical evidence addressing the nexus issue was a May 2011 opinion and a 2012 addendum to that opinion. R. at 19. The VA examiner concluded that because no audiometric test was performed as part of Mr. McKinney's 1971 separation examination, she could not offer a "definitive" nexus opinion "without resorting to speculation." R. at 96, 108.[13] The Board concluded that the VA examiner's opinion "provides neither positive nor negative support" for the claim. R. at 19. Relying on the examiner's opinion, the Board concluded that "additional development" was not needed. R. at 8.

The appellant argues that the VA "examiner did not provide an adequate rationale for why it would be speculative to render" a nexus opinion. Appellant's Br. at 21. The Secretary disagrees with Mr. McKinney's assertion. Secretary's Br. at. 21-22. "An examiner's conclusion that a diagnosis or etiology opinion is not possible without resort to speculation is a medical conclusion just as much as a firm diagnosis or a conclusive opinion." *Jones v. Shinseki*, 23 Vet.App. 382-90 (2010). As with other medical opinions, the examiner must provide a rationale for his opinion. *See Stefl v. Nicholson*, 21 Vet.App. 120, 124 (2007) (stating that a medical examiner must support an opinion with an analysis that the Board can consider and weigh); *see also Nieves-Rodriguez v. Peake*, 22 Vet.App. 295, 304 (2008) ("[M]ost of the probative value of a medical opinion comes from its reasoning."). Thus, "before the Board may rely on a VA examiner's conclusion that an etiology opinion would be speculative, the examiner must explain the basis for such an opinion or the basis for the examiner's opinion must be apparent from the Board's review of the evidence." *Id.*

---

[13] In March 2012, this same VA examiner submitted an addendum to her May 2011 opinion reiterating her opinion that, without a separation examination, she could not offer an opinion regarding the effect of in-service noise exposure on Mr. McKinney's hearing without resorting to speculation. R. at 96.

16

Here, the VA examiner did not provide a rationale for her conclusion that in order to render a nexus opinion, an audiology test conducted contemporaneously with a separation examination was needed. Although the VA examiner clearly identified the evidence she needed, it is unclear that the phrase in her 2011 opinion and 2012 addendum "without resorting to speculation" reflects the limits of knowledge in the medical community at large or the limits of the VA examiner's knowledge. R. at 96, 108.

It is possible that the examiner's opinion is based on the supposition that hearing loss attributable to noise exposure would result in an immediate, measurable change in hearing acuity that would be reflected on an audiometric test. However, the cursory statement again makes her rationale unclear. Nor does the Board's review of the evidence clarify the basis for the examiner's opinion. The Board, without discussion, merely summarized the VA examiner's statement, adopted her opinion, and proceeded to deny the claim because of a lack of nexus evidence. R at 19. Thus, the basis of the examiner's opinion is not apparent from either the examiner or the Board. The Court is placed in the position of having to surmise the rationale for the VA examiner's conclusion that a nexus opinion would be speculative.

Even if the Court were to assume that the VA examiner's opinion was based on the notion that hearing loss resulting from noise exposure would cause an immediate change in hearing, the examiner's opinion is deficient because she did not consider evidence in the record that may indicate that such a change occurred in Mr. McKinney's hearing shortly after his in-service noise exposure. Mr. McKinney testified at a January 2011 hearing that he *first* noticed a change in his hearing during the "[19]70's" R. 155-56.[14] This testimony is relevant because Mr. McKinney served in the military between 1969 and 1971. If Mr. McKinney first noticed hearing loss during service or soon after discharge, this fact may have assisted the VA examiner in determining the likelihood that Mr. McKinney's in-service exposure to acoustic trauma affected his hearing. But, there is no indication that the VA examiner considered the import of Mr. McKinney's testimony.

A medical opinion is adequate when it is based upon consideration of the veteran's prior medical history and examinations and also describes the disability in sufficient detail so that the

---

[14] The Board did not make a finding that this testimony was not credible. R. at 19.

17

Board's "'evaluation of the claimed disability will be a fully informed one.'" *Ardison v. Brown*, 6 Vet.App. 405, 407 (1994) (quoting *Green v. Derwinski*, 1 Vet.App. 121, 124 (1991)). Here, the VA examiner's failure to consider Mr. McKinney's testimony when formulating her opinion renders that opinion inadequate. *See Barr v. Nicholson,* 21 Vet.App. 301, 310-11 (2007) (finding that a medical examination that ignores lay assertions regarding continued symptomatology is inadequate because it fails to take into account the veteran's prior medical history); *Dalton v. Nicholson*, 21Vet.App. 23, 39 (2007) (finding a medical examination inadequate where the examiner "impermissibly ignored the appellant's lay assertions that he sustained a back injury during service"). Because the examiner did not did not provide a clear rationale for her opinion or consider relevant evidence in formulating her opinion, the Court holds that the Board erred in relying on that opinion to deny Mr. McKinney's claim. Accordingly, this matter is vacated and remanded for the Board to readjudicate Mr. McKinney's hearing loss claim. On remand, the Board should obtain a medical opinion that is consistent with this opinion.

## II. RESPIRATORY DISABILITY

### A. Background

In April 2007, Mr. McKinney filed a claim for disability compensation benefits for a respiratory disorder. R. at 675. Mr. McKinney stated that the Navy ships on which he served were "full of asbestos." R. at 610-11; *see also* R. at 154 (testimony that Mr. McKinney's naval duties included "clean[ing] up paint, treat[ing] ship for rust"). In support of his claim, Mr. McKinney submitted an October 1996 medical opinion from Dr. Schonfeld, a pulmonologist, stating that he had reviewed a single chest x-ray showing the type of bilateral pleural thickening "seen following asbestos exposure." R. at 680. Additionally, Dr. Schonfeld commented that the chest x-ray was "consistent with a diagnosis of pleural asbestosis."[15] *Id.* Mr. McKinney also submitted a December 1996 opinion from Dr. Altschuler, another pulmonologist, who concurred with Dr. Schonfeld's diagnosis. R. at 681. Dr. Altschuler stated that he had reviewed "chest films with findings of bilateral pleural thickening" and noted that the appellant's symptoms included shortness

---

[15] "Asbestosis" is a "form of pneumoconiosis (silicatosis) caused by inhaling fibers of asbestos, marked by interstitial fibrosis of the lung." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 161-62 (32d ed. 2012).

18

of breath and a "noticeable" cough. *Id.* Dr. Altschuler diagnosed Mr. McKinney with bilateral "asbestos-related pleural disease." *Id.* Further, Dr. Altschuler opined that Mr. McKinney's "present malady [was] caused by the asbestos toxin exposure incident to his sailing occupation." *Id.*

Finally, Mr. McKinney submitted a November 2003 referral from the Methodist Charlton Medical Center to Dr. Attiah, a pulmonologist. R. at 614. The referral worksheet noted that Mr. McKinney had dyspnea (shortness of breath) with a history of "apparent exposure to asbestos." *Id.* Mr. McKinney was referred to Dr. Attiah for "pulmonary function tests related to asbestos exposure." *Id.* Mr. McKinney signed an authorization and consent-to-release-information form to allow the RO to obtain Dr. Attiah's treatment records "for asbestos exposure." R. at 615-17. Mr. McKinney stated that Dr. Attiah's office was located at the Methodist Charlton Medical Center and provided the RO with the address of the medical center as well as a phone number for Dr. Attiah. *Id.*

In September 2007, the RO requested Dr. Attiah's treatment records for pleural asbestosis from the Methodist Charlton Medical Center. R. at 588. In November 2007, the RO made a second request for these records. R. at 589. In December 2007, the Methodist Charlton Medical Center informed the RO that Dr. Attiah's office was not located at that facility and suggested that the RO contact him at the phone number Mr. McKinney provided. R. at 570. There is no indication that the RO made any further attempt to contact Dr. Attiah.

In February 2008, Mr. McKinney underwent a VA respiratory examination. R. at 562-63. The examiner noted that Mr. McKinney's service medical records did not include any treatment for respiratory complaints and that a 1971 chest x-ray revealed no abnormality. R. at 562. Mr. McKinney reported that he had been experiencing shortness of breath for the last 20 to 30 years both at rest and on exertion. *Id.* The VA examiner noted that a 2006 chest x-ray revealed no abnormality and that 2007 pulmonary function tests showed a "restrictive pattern with mild impairment." *Id.* The examiner opined that Mr. McKinney's "shortness of breath is less likely than not secondary to his asbestos." R. at 563.

In February 2008, the RO denied the claim for a respiratory disability. R. at 1180-84. The appellant appealed the decision by filing a Notice of Disagreement. R. at 487, 489. On August 4, 2008, the RO issued a Statement of the Case, which stated that "[a]ll attempts to locate

the treatment reports from Methodist Charlton Medical Center, from both the veteran and the treating facility, were unsuccessful." R. at 462.

The record also includes a 2009 VA medical record indicating that Mr. McKinney was diagnosed with restrictive lung disease. R. at 276. An October 2009 chest x-ray revealed "no evidence of pleural disease." R. at 240. Additionally, a September 2009 computerized tomography (CT) scan revealed "no evidence of pleural plaques or asbestosis." R. at 284.

In April 2011, the Board denied entitlement to service connection for a respiratory condition, to include as due to asbestos exposure. R. at 138-50. Mr. McKinney appealed this decision to the Court, and in March 2012, the parties entered into a joint motion for remand (JMR), which the Court subsequently granted. The parties agreed that the Board failed to discuss Dr. Schonfeld's October 1996 "favorable medical opinion" and to "fully assess lay evidence of record." R. at 67.

In the April 2013 decision here on appeal, the Board denied the claim for a respiratory disability. R. at 12-15. The Board acknowledged that two pulmonologists diagnosed Mr. McKinney with asbestosis in 1996. *Id.* But the Board denied disability compensation benefits for asbestosis because there was no proof of a current diagnosis of asbestosis. *Id.* Additionally, the Board denied disability compensation benefits for restrictive lung disease on the basis that the evidence demonstrated that Mr. McKinney's restrictive lung disease was not "etiologically related to service." *Id.*

## B. Board's Treatment of Medical Evidence

The Secretary must "make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim for a benefit." 38 U.S.C. § 5103A; *see Loving v. Nicholson*, 19 Vet.App. 96, 102-03 (2005). The Secretary's duty to assist includes, in appropriate cases, the duty to conduct a thorough and contemporaneous medical examination. 38 U.S.C. § 5103A(d)(1); *see Stefl v. Nicholson*, 21 Vet.App. 120, 123 (2007); *Green v. Derwinski*, 1 Vet.App. 121, 124 (1991). "[O]nce the Secretary undertakes the effort to provide an examination when developing a service-connection claim, . . . he must provide an adequate one." *Barr v. Nicholson*, 21 Vet.App. 303, 311 (2007). An examination is adequate "where it is based upon consideration of the veteran's prior medical history and examinations and also describes the disability, if any, in sufficient detail so that the Board's 'evaluation of the claimed disability will be

a fully informed one.'" *Stefl*, 21 Vet.App. at 123 (quoting *Ardison v. Brown*, 6 Vet.App. 405, 407-08 (1994)); *Green*, 1 Vet.App. at 124.

As with any finding on a material issue of fact and law presented on the record, the Board must support its determination that the claimant does not have a current disability for VA purposes with an adequate statement of reasons or bases that enables the claimant to understand the precise basis for that determination and facilitates review in this Court. 38 U.S.C. § 7104(d)(1); *McClain v. Nicholson*, 21 Vet.App. 319, 321 (2007); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of evidence, account for evidence that it finds persuasive or unpersuasive, and provide reasons for its rejection of material evidence favorable to the claimant. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

Mr. McKinney argues that the Board did not give an adequate statement of reasons or bases for its conclusion that he did not have a current asbestos-related disability. Appellant's Br. at 12-14. Mr. McKinney points out that the Board's conclusion implies that he no longer has asbestosis. The Board's determination appears to be premised on the idea that his asbestosis, which was present in 1996, and perhaps as late as 2003, was resolved. *Id.*. Mr. McKinney argues that this is a medical conclusion that the Board could not reach properly without having independent medical evidence in the form of a medical opinion that addresses whether Mr. McKinney's asbestosis resolved. Appellant's Br. at 12-13. In response, the Secretary argues that the 1996 medical reports are not "relevant evidence" because those diagnoses of an asbestos-related disability predate Mr. McKinney's claim by more than a decade. Secretary's Br. at 11-12. Because the Secretary asserts that these reports were not "relevant," he contends that "the Board had no obligation to further discuss why [Mr. McKinney] did not have a current asbestos-related disability" or to obtain a medical opinion to address the previous diagnoses. *Id.*

The Court agrees with Mr. McKinney that the Board gave an inadequate statement of reasons or bases for summarily rejecting the 1996 medical reports because they were not sufficiently proximate to the date of the Mr. McKinney's claim. The Board does not question the accuracy of any of the medical diagnoses in the record. Yet, the Board determined that Mr. McKinney did not have a current asbestos-related respiratory disorder without addressing the nature of the claimed

21

asbestos-related disability, including whether Mr. McKinney's asbestos-related respiratory disorder resolved itself or was incorrectly diagnosed, or whether it was acute or chronic. Without addressing these issues, the Court concludes that the Board's discussion of the evidence is inadequate.

The Court is also not persuaded by the Secretary's argument that because the 1996 medical reports predated Mr. McKinney's claim these records were not relevant. Although the reports significantly predate the date of the veteran's claim and do not, alone, establish the presence of a current asbestos-related disability, they are relevant because the records detail Mr. McKinney's claimed in-service exposure to asbestos and contain diagnoses of asbestosis. R. at 680-81. Therefore, contrary to the Secretary's argument, these records are "relevant on their face" to whether any current respiratory disability is related to the purported in-service asbestos exposure, and the Board was required to address the reports in assessing entitlement to service connection on that basis. *See Moore v. Shinseki*, 555 F.3d 1369, 1375 (Fed. Cir. 2009) (concluding that unobtained Army hospital records were relevant to a claim for a higher disability evaluation even though the hospitalization occurred before the period on appeal, because those records "may well contain evidence that [the veteran] suffers from a serious, and perhaps chronic, psychiatric disorder"); *Romanowsky v. Shinseki*, 26 Vet.App. 289, 294 (2013) (rejecting the Board's finding that evidence that a disability was diagnosed before the claimant filed a claim for service connection was categorically not relevant to the issue whether the veteran had a current disability); *see also AZ v. Shinseki*, 731 F.3d 1303, 1311 (Fed. Cir. 2013) (explaining that "VA must consider all evidence 'pertinent' to service connection" (quoting *Fagan v. Shinseki*, 573 F.3d 1282, 1287-88 (Fed. Cir. 2009))).

The Board's summary rejection of the 1996 medical reports is related to another inadequacy in the Board's reasons or bases: the Board relied on the 2008 VA examination report even though the examiner did not even mention the veteran's prior diagnoses of asbestosis, much less indicate that asbestosis had either previously been misdiagnosed or had resolved. R. at 562-63; *see Gabrielson v. Brown*, 7 Vet.App. 36, 40 (1994) (explaining that the Board "cannot evade [its] statutory responsibility merely by adopting [a medical examiner's] opinion as its own, where . . . the [examiner's] opinion fails to discuss all the evidence which appears to support appellant's position"). Given the Board's duty "to interpret reports of examination in the light of the whole recorded history,

22

reconciling the various reports into a consistent picture," the Board was required to address the competing evidence of record as to whether the veteran currently has asbestosis and, if necessary, to obtain independent medical evidence to resolve that factual issue. 38 C.F.R. § 4.2; *see Clemons v. Shinseki*, 23 Vet.App. 1, 6 (2009) (stating that when the Board cannot, on its own, resolve a medical question regarding the diagnosis and nature of a claimant's disability, then the Board should obtain additional medical evidence addressing the issue); *Colvin v. Derwinski*, 1 Vet.App. 171, 172 (1990) (holding that the Board "must consider only independent medical evidence to support [its] findings rather than provide [its] own medical judgment in the guise of a Board opinion" and advising the Board to seek additional medical evidence when the medical evidence of record is "insufficient" to decide the claim). Its failure to do so in this case further diminishes the adequacy of its reasons or bases for its decision. *See Caluza*, 7 Vet.App. at 506; *Gilbert*, 1 Vet.App. at 52.

Lastly, the Court notes that the Board characterized Mr. McKinney's claim as involving "[e]ntitlement to service connection for a respiratory disability, to include as due to asbestos exposure." R. at 3. Therefore, the Board recognized that the scope of Mr. McKinney's claim was broad and included entitlement to service connection for *any* respiratory illness, including one caused by asbestos exposure. *See Clemons*, 23 Vet.App. at 5 (holding that an initial claim for service connection must be "considered a claim for any . . . disability that may be reasonably encompassed" by the claim considering such factors as "the claimant's description of the claim; the symptoms the claimant describes; and the information the claimant submits or that the Secretary obtains in support of the claim"). Yet, despite its broad characterization of Mr. McKinney's claim, the Board did not adequately consider whether any current respiratory disability was related to service generally.

Indeed, the Board acknowledged that the appellant currently suffered from restrictive lung disease, but it determined that there was no competent medical evidence "suggest[ing] that restrictive lung disease is related to service." R. at 15. However, in its analysis of entitlement to service connection for restrictive lung disease, the Board overlooked the fact that the February 2008 VA examination report that it had obtained to decide Mr. McKinney's claim focused solely on whether a respiratory disability was related to in-service asbestos exposure and did not address linkage to service on any other basis. R. at 563 (opining that the veteran's "shortness of breath is less likely

23

than not secondary to his asbestos [exposure]"). Given that the Board characterized the claim broadly to include all possible service-related etiologies and not just asbestos exposure (R. at 3), the Court concludes that the Board failed to explain adequately why it relied on the February 2008 VA examination report to deny this aspect of Mr. McKinney's claim when that report did not address whether Mr. McKinney's respiratory disorder was related to service. *See Stefl,* 21 Vet.App. at 123 (explaining that, to be adequate, a medical examination or opinion must "describe[] the disability . . . in sufficient detail so that the Board's 'evaluation of the claimed disability will be a fully informed one'" (quoting *Ardison,* 6 Vet.App. at 407) (internal quotation marks omitted)); *see also Barr v. Nicholson*, 21 Vet.App. 303, 311 (2007) ("[O]nce the Secretary undertakes the effort to provide an examination . . . he must provide an adequate one or, at a minimum, notify the claimant why one will not or cannot be provided."). The Board therefore provided inadequate reasons or bases for relying on that examination report to deny service connection for restrictive lung disease on any basis other than via asbestos exposure. *See Ardison*, 6 Vet.App. at 407 (holding that the Board errs when it relies on an inadequate medical examination report or opinion).

## C. Duty To Assist

The Secretary has a duty to assist claimants in developing their claims. 38 U.S.C. § 5103A. That duty to assist includes the duty to make "reasonable efforts to obtain relevant records," as long as the claimant "adequately identifies" those records to the Secretary and authorizes the Secretary to obtain them. 38 U.S.C. § 5103A(b)(1); *see also Loving,* 19 Vet.App. at 102. VA will make reasonable efforts to obtain relevant private medical records generally consisting of an initial request for the records and, if the records are not received, at least one followup request. 38 C.F.R. § 3.159(c)(1) (2015). If the Secretary is unable to obtain those records after making reasonable efforts to do so, the Secretary must provide notice of that fact to the claimant. *See* 38 U.S.C. § 5103A(b)(2); 38 C.F.R. § 3.159(e). In addition to notifying the claimant what records VA was unable to obtain and the efforts made to obtain those records, such notice must include "[a] description of any further action VA will take regarding the claim, including but not limited to notice that VA will decide the claim based on evidence of record unless the claimant submits the records VA was unable to obtain," and "notice that the claimant is ultimately responsible for providing the evidence." 38 C.F.R. § 3.159(e)(1)(iii-iv). The Board's determination that VA has satisfied the duty

to assist is reviewed under the "clearly erroneous" standard of review. *Hyatt v. Nicholson*, 21 Vet.App. 390, 395 (2007); *see also Gilbert,* 1 Vet.App. at 52. A finding of fact is clearly erroneous when the Court, after reviewing the entire evidence, "is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also Gilbert*, 1 Vet.App. at 52.

Mr. McKinney argues that the Board violated the duty to assist when it failed to make reasonable efforts to obtain Dr. Attiah's records and that the Board did not notify him of the efforts it had taken to obtain the records or the reasons for its decision to cease its attempts to obtain the records. Appellant's Br. at 14-16. The Secretary counters that Mr. McKinney is precluded from making this argument because it was not included in the earlier JMR. Secretary's Br. at 12-15. The Court found that the clarity and specificity of a JMR is critical to determining the scope of the Board's duty on remand. *Carter v. Shinseki*, 26 Vet.App. 534, 543 (2014), *vacated on other grounds sub. nom*. *Carter v. McDonald*, 794 F.3d 1342 (Fed. Cir. 2015). The Court in *Carter* stated that

> when an attorney agrees to a [JMR] based on specific issues and raises no additional issues on remand, the Board is required to focus on the arguments specifically advanced by the attorney in the motion . . . and those terms will serve as a factor for consideration as to whether or to what extent other issues raised by the record need to be addressed.

26 Vet.App. at 542-43. Here, the parties' JMR stated that "the Board is obligated to conduct a critical examination of the justification for its previous decision." R. at 74 (citing *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991)). In *Carter,* the Court found that similar language in the JMR before the Court showed that the parties required the Board to examine the record for any issues that were reasonably raised. Accordingly, the Court concludes that the JMR in this case did not limit the scope of the Board's review of newly raised arguments.

Having determined that Mr. McKinney's duty-to-assist argument is not precluded, the Court will turn to the merits of that argument. Here, the Board generally discussed VA's duties to assist Mr. McKinney, finding that all necessary development had been completed and that no evidence remained outstanding, including private treatment records. R. 7-8. However, the Board did not discuss the June 2007 authorization and consent-to-release forms signed by Mr. McKinney asking the RO to obtain Dr. Attiah's 2003 medical records for "asbestos exposure" or VA's failed attempts

to do so. Specifically, the Board did not discuss the fact that the RO made no further attempt to contact Dr. Attiah even after receiving a letter from the Methodist Charlton Medical Center stating that it did not have Dr. Attiah's medical records and suggesting that the RO contact Dr. Attiah at the telephone number Mr. McKinney provided for Dr. Attiah on the June 2007 forms. Additionally, there is no record of any notice to Mr. McKinney of the RO's efforts to obtain Dr. Attiah's records.

The RO's failure to further attempt to contact Dr. Attiah after learning this information is particularly glaring because the Board found that the only evidence in the record that Mr. McKinney was diagnosed with asbestosis was evidence from 1996. R. at 15. Yet, the 2003 referral sheet from the Methodist Charlton Medical Center indicates that the referring physician attributed Mr. McKinney's current respiratory disorder to "apparent exposure to asbestos." R. at 614 (2003 worksheet referring Mr. McKinney to Dr. Attiah for "[p]ulmonary function [t]ests related to asbestos exposure"). Because the nature of Mr. McKinney's respiratory disorder is a key medical issue in this case, and VA had previously determined that these records were relevant when it originally sought to acquire them, Dr. Attiah's 2003 medical records are relevant to the issue regarding the nature of Mr. McKinney's respiratory disorder. *See Golz v. Shinseki*, 590 F.3d 1317, 1321 (Fed. Cir. 2010) (holding that VA's duty to assist extends to potentially "relevant" evidence, i.e., "records that have a reasonable possibility of helping to substantiate the veteran's claim"). Accordingly, the Board erred in finding that VA fulfilled its duty to assist Mr. McKinney, and remand is required for further development. *See Hyatt*, 21 Vet.App. at 395.

### III. CONCLUSION

After consideration of the appellant's and the Secretary's briefs, and a review of the record on appeal, the Board's April 10, 2013, decision is VACATED except to the extent that the Board made a favorable finding that Mr. McKinney was exposed to loud noise during service. All the vacated matters are remanded for further adjudication consistent with this opinion.

BARTLEY, *Judge,* joining in part, concurring in part, and dissenting in part: I dissent from part I of the decision to the extent that the majority concludes that "Mr. McKinney had a preexisting hearing loss that was 'noted'" on his entry examination report. *Ante* at 8. Although I agree with my esteemed

26

colleagues as to part I's ultimate conclusion that Mr. McKinney did not demonstrate a hearing defect, infirmity, or disorder upon entry to service, there is no need to address the meaning of those terms because the naval examiner at the time of the veteran's entry in 1969 did not note any hearing issue whatsoever, let alone hearing loss, and the appeal should be decided on that basis.[16] Section 1111 of title 38, U.S. Code, imposes a requirement that veterans are presumed sound except as to any defect, infirmity, or disorder "*noted at the time of the examination, acceptance, and enrollment*" into service. 38 U.S.C. § 1111 (emphasis added); *see* 38 C.F.R. § 3.304(b) (2015) (implementing regulation). Because that temporal requirement was not met in Mr. McKinney's case, he should be presumed sound on that basis, rendering most of the Court's part I analysis unnecessary.

The crux of my disagreement stems from the majority's willingness to accept audiology test results from Mr. McKinney's January 1969 entry examination, which were never interpreted by the entry examiner as indicating a hearing issue, as a notation for purposes of section 1111. Indeed, in order to conclude that hearing loss was noted at entry, the Board and the majority rely on a May 2011 VA opinion rendered 42 years after Mr. McKinney's service entry, as well as on hearing loss standards referenced in *Hensley v. Brown*, 5 Vet.App. 155, 157 (1993), a case decided 24 years after Mr. McKinney's service entry. The majority acknowledges that the naval examiner did not list ears or hearing in the section of the entry examination report reserved for noting "Defects and Diagnoses," did not otherwise comment on the audiology test results, and did not indicate that he believed that the veteran's hearing was compromised in any way. R. at 896-97; *see ante* at 9 (majority concedes that "the naval examiner *did not note* defective hearing" (emphasis added)). Instead, the naval examiner assigned Mr. McKinney a PULHES score of 1 for hearing and ears, R. at 897, indicating the highest level of fitness for that category, *see ante* at 3. Relying on post-entry examination interpretation to find that Mr. McKinney had hearing loss at entry is contrary to the statute.

Given the 1969 examiner's silence as to the veteran's hearing, it is not possible now for VA to discern the interpretation or significance the entry examiner attached to Mr. McKinney's audiology results. Nevertheless, the Board and the majority sanction using information from 2011 and 1993

---

[16] I join with the analysis and result in part II of the decision as to the veteran's respiratory disability.

without acknowledging the section 1111 and § 3.304(b) temporal requirement that should bar retrospective interpretation of an entry examination in this manner. *Ante* at 8-9; *see* 38 U.S.C. § 1111.

Contrary to the majority's suggestion, *ante* at 8, *Hensley* did not relax or otherwise abrogate this requirement. Unlike Mr. McKinney, Mr. Hensley received a defective hearing diagnosis upon entry into service, 5 Vet.App. at 156-57, and there was no need in that case for retrospective interpretation, and, unsurprisingly, the Court in *Hensley* did not discuss section 1111's and § 3.304(b)'s noting requirement. Accordingly, the Board and the majority's reliance here on *Hensley* is misplaced.

Permitting retrospective interpretation of an entry examination allows VA to transform a test result not identified at the time of entry as out of the ordinary into noting at the time of entry, thereby perverting the statutory requirement. This retrospective interpretation will create troubling effects: Men and women entering service would be deemed fully fit to fight and die, with the entry examiner indicating nothing preexisting; but after service those men and women, now veterans, would be informed that they were less than whole at entry, that there was preexistence, and that they have a significant handicap in pursuing disability benefits, i.e., the presumption of soundness, in most cases, would not apply.

I would hold that no noting of any kind relating to Mr. McKinney's hearing occurred at entry and that such absence reflects that the veteran's hearing was deemed by the 1969 naval examiner to be completely unremarkable at entry. On that basis, Mr. McKinney should be presumed sound as to his hearing. VA is not without recourse where an entry examiner fails to note a preexisting issue at the time of entry, as may happen from time to time. Any such failure is amply provided for in the statute–in such cases VA may present clear and unmistakable evidence to rebut the presumption that the veteran was sound at entry. *See* 38 U.S.C. § 1111 (authorizing VA to rebut the presumption of soundness "where clear and unmistakable evidence demonstrates that the injury or disease existed before acceptance and enrollment and was not aggravated by such service"); H.R. REP. NO. 78-403, at 2 (1943) (indicating that the presumption of soundness must be rebuttable because defects, infirmities, or disorders are sometimes "*necessarily* [ ] overlooked due to the speed with which persons are taken into service during a war emergency" (emphasis added)); *May 13, 1943 Hearing*

28

*Before the H. Comm. on World War Veterans Legislation*, 78th Cong. 54 (1943) (recognizing that"neglect on the part of the doctors" performing military entry examinations under "the stress of building up manpower" necessitated making the presumption of soundness rebuttable).  Accordingly, I must respectfully dissent from the majority's analysis in part I of its decision.